FILED 26 FEB '25 14:50 USDC-ORE

# US DISTRICT COURT
# FOR THE DISTRICT OF OREGON
# EUGENE DIVISION

BLEAUREGARD KASADU

     Plaintiff

    v.

MID-WILLAMETTE VALLEY

COMMUNITY ACTION AGENCY

     Respondent

Case No. 6:25-CV-00324-AA

)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

(Non-Prisoner Complaint)

Page 1 - COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. Index

I. Index...........................................................................................2

II. Appendix.....................................................................................3

III. Authorities................................................................................5

   1. Cases.....................................................................................5

   2. Constitution............................................................................6

   3. Rules & Directives..................................................................6

   4. Statutes................................................................................7

IV. The Parties to This Complaint....................................................9

V. Basis for Jurisdiction................................................................10

VI. Statement of Claim.................................................................12

   1. Public Function Test.............................................................13

   2. Nexus Test..........................................................................24

   3. State Compulsion Test..........................................................27

   4. Entwinement Test.................................................................35

   5. Right of Administrative Due Process.......................................37

   6. Right of Association & Privacy................................................37

   7. Fraternization Policies...........................................................44

   8. Restricting Personal Connections...........................................48

Page 2 – COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS

9. Valentine's Gifts..................................................................50

10. Morning Aversion..............................................................53

11. The Meeting.....................................................................56

12. Other Staff Members.........................................................65

13. State's Interest................................................................67

VII. Injuries...........................................................................78

VIII. Relief.............................................................................80

IX. Certification and Closing....................................................83

X. Appendix.....................................................................App-1

## II. Appendix

Benton v. Maryland, 395 U.S. 784 (1969)...............................App-1

Blum v. Yaretsky, 457 U.S. 991 (1982)..................................App-1

Brentwood Academy v. Tennessee Secondary School Athletic Assn.,

531 U.S. 288 (2001)..........................................................App-4

Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)...............App-8

Eisenstadt v. Baird, 405 U.S. 438 (1972).............................App-11

Griswold v Connecticut 381 U.S. 479 (1965).......................App-13

Page 3 - COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS

Marsh v. Alabama, 326 U.S. 501 (1946)..............................................App-15

Meyer v. Nebraska, 262 U.S. 390 (1923)...........................................App-16

Obergefell v. Hodges, 576 U.S. 644 (2015)........................................App-17

Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)...................................App-18

West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937)......................App-24

Appendix 1 – Kasadu and Lombardi,

Emails Between Blu and Kaela (Oct. 29, 2024)..............................App-25

Appendix 2 – MWVCAA,

Transitional Shelter Rules and Guidelines (Aug. 2023)..................App-27

Appendix 3 – Kasadu and Morales,

Policy Acknowledgement & Agreements (Nov. 29, 2023)...............App-31

Appendix 4 – Kasadu and Diaz,

Behavior Modification Contract, MWVCAA (Feb. 11, 2025)............App-34

Appendix 5 – Kasadu, Lombardi, and Sukacz,

Emails Between Mike, Kaela, and Blu (Feb. 6-7, 2025)..................App-36

III. Authorities


## 1. Cases


Benton v. Maryland, 395 U.S. 784 (1969)....................................................67

Blum v. Yaretsky, 457 U.S. 991 (1982)........................................................27

Brentwood Academy v. Tennessee Secondary School Athletic Assn., 531

U.S. 288 (2001)..........................................................................................35

Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961)....................24

Eisenstadt v. Baird, 405 U.S. 438 (1972)..............................................38, 42

Griswold v Connecticut 381 U.S. 479 (1965)..............................................67

Marsh v. Alabama, 326 U.S. 501 (1946).....................................................13

Mathews v. Eldridge, 424 U.S. 319 (1976).................................................37

Meyer v. Nebraska, 262 U.S. 390 (1923)....................................................67

Obergefell v. Hodges, 576 U.S. 644 (2015).................................................67

Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)...........................................37

West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937)...............................37

## 2. Constitution

Or. Const. art. III, § 1................................................................30

Or. Const. art. XV, § 3.............................................................30

U.S. Const. amend. I, Assembly Clause....................................38

U.S. Const. amend. I, Free Speech Clause................................38

U.S. Const. amend. IV, Unreasonable Search and Seizure Clause...........38

U.S. Const. amend. IX..............................................................38

U.S. Const. amend. XIV, § 1, Due Process Clause....................38

## 3. Rules & Directives

City of Salem, Oregon, Charter, pmbl.......................................30

Or. Exec. Order No. 23-02........................................................19

Or. Exec. Order No. 24-02........................................................19

Or. Exec. Order No. 25-01........................................................19

Page 6 – COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS

1

## 4. Statutes

2

3

4    5 U.S.C. § 3331.........................................................................30

5

6    28 U.S.C. § 1331.......................................................................10

7    42 U.S.C. § 1983.......................................................................10

8    Community Opportunities, Accountability, and Training and Educational

9
     Services Act of 1998, Pub. L. No. 105-285, 112 Stat. 2702.......................16
10

11   Economic Opportunity Act, Pub. L. No. 88-452, 78 Stat. 508....................15

12   OAR 813-230-0000.................................................................14

13
     OAR 813-230-0005.................................................................14
14

15   OAR 813-230-0010.................................................................14

16   OAR-813-270-0020................................................................22

17
     OAR 813-270-0080................................................................35
18

19   Omnibus Budget Reconciliation Act, Pub. L. No. 97-35, 95 Stat. 357........15

20

21

22

23

24

25

26

27

28   Page 7 - COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS

Or. H.B. 5019.............................................................................................. 20

Or. S. B. 5701.............................................................................................. 21

ORS 190.010.............................................................................................. 11

ORS 204.020.............................................................................................. 30

ORS 221.903.............................................................................................. 30

ORS 221.908.............................................................................................. 30

ORS 458.505.......................................................................................... 14, 27

1     IV. The Parties to This Complaint

2

3

4     1. The Plaintiff

5

6     <u>Name</u>: Bleauregard Kasadu

7     <u>Address</u>: 694 Church Street NE Salem, OR 97301

8

9     <u>County</u>: Marion

10

11     <u>Telephone Number</u>: 503-383-2811

12     <u>Email Address</u>: D4vyJ0n3513@outlook.com

13

14

15

16     2. The Defendant

17     <u>Name</u>: Mid-Willamette Valley Community Action Agency

18

19     <u>Address</u>: 2475 Center Street NE Salem, OR 97301

20

21     <u>County</u>: Marion

22     <u>Telephone Number</u>: 503-585-6232

23

24

25

26

27

28     Page 9 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

V. Basis for Jurisdiction

3. Under 28 U.S.C. § 1331 and 42 U.S.C. § 1983, Plaintiff is bringing a civil claim to this court against Defendant for the deprivation of fundamental civil rights secured by the US Constitution.

4. Section 1331 allows Plaintiff to bring forward a civil claim in this court based on federal questions regarding the 1st, 4th, 9th, and 14th Amendments to the US Constitution.

5. The State Action Doctrine applies standards and considerations to determine if the actions of an entity constitutes the actions of the state, wherein those actions are subject to constitutional requirements.[1] Claims of civil rights violations by a private entity acting as a state actor may be brought forward in this court, pursuant to Section 1983.

6. Defendant is a state actor in their operations generally and at Salem Navigation Center ("the shelter") because they are a community

---

[1] Legal Information Institute, State Action Doctrine, Cornell Law School website (accessed Feb. 18, 2025);
https://www.law.cornell.edu/constitution-conan/amendment-14/state-action-doctrine#fn2amd14

Page 10 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

action agency (CAA), and their operations as well as interconnections with

government passes 4 tests used to determine state actor status; the Public

Function Test, Nexus Test, State Compulsion Test, and the Entwinement

Test.

7. Section 1983 allows defendants to be found liable only when they

have acted "under color of any statute, ordinance, regulation, custom, or

usage, of any State or Territory or the District of Columbia."

8. Defendant acted under OAR 813-230-0005(2), ORS 458.505(1)(a),

(4), OAR 813-270-0000, and ORS 190.010(3) by executing authority as a

CAA under contracts with OHCS and City of Salem to operate the Marion

County Rapid Rehousing Program (MCRRP) and Transitional Shelter

Program (TSP) at the Salem Navigation Center. Deprivation of civil rights

occurred within such operation.

9. Plaintiff alleges that Defendant violated his right to privacy and to

form intimate associations under the 1st, 4th, 9th, and 14th Amendments to

the US Constitution by applying Article "Social Conduct" Section Q on page

3 as well as Article XII Section B on page 11 of their Transitional Shelter

Program Rules and Guidelines-- and potentially other policies and

Page 11 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

procedures in their company-- to prohibit and substantially compromise Plaintiff from forming a friendship and/or romantic partnership with Victoria Howard ("Vee"), Ryan, Dominic, Justin, and Valerie while he satisfied the requirement of MCRRP to participate in the TSP by residing at the Salem Navigation Center operated by Defendant.

10. Additionally, Defendant deprived Plaintiff of his due process rights under the 14th Amendment by arbitrarily compelling him to sign a behavior modification contract for sexual harassment when that conduct had not been committed.

## VI. Statement of Claim

11. The facts underlying the claim involves the ongoing enforcement of Defendant's social contact and fraternization policies, which prohibits Plaintiff from forming personal, meaningful connections with Vee and other staff members, including engaging in personal conversations, developing friendships, and pursuing romantic relationships inside and outside the premises of Salem Navigation Center-- even when there is no supervisory roles, professional conflict of interest, or a special need to apply those

Page 12 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

policies to Plaintiff to preserve his and staff members' safety and well-being. The status of Defendant as a state actor and the specific rights being deprived must be analyzed first before delving into the incidents leading to the claim.

1. Public Function Test

12. The Public Function Test is used to determine if an entity is a state actor, based on whether it performs a function that has been traditionally reserved to the state.[2] Defendant primarily performs functions associated with reducing and preventing poverty, which are functions traditionally held by government. They are a CAA and are part of Oregon's community action agency network, acting as the delivery system for state and federal antipoverty funding programs dispersed by the Oregon Housing and

---

[2] Marsh v. Alabama, 326 U.S. 501 (1946);
https://www.law.cornell.edu/supremecourt/text/326/501

Page 13 - COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Community Services department (OHCS).[3][4][5][6][7] Defendant's mission is "empowering people to change their lives and exit poverty by providing vital services and community leadership".[8]

13. The origin of CAAs such as Defendant dates back to President Lyndon Johnson's War on Poverty initiatives. He signed the Economic Opportunity Act (EOA) in 1964 to

14. "eliminate the paradox of poverty in the midst of plenty in this Nation by opening to everyone the opportunity for education and

---

[3] OAR 813-230-0010(1), (2); https://oregon.public.law/rules/oar_813-230-0010

[4] OAR 813-230-0000(3); https://oregon.public.law/rules/oar_813-230-0000

[5] OAR 813-230-0005; https://oregon.public.law/rules/oar_813-230-0005

[6] ORS 458.505(1), (2); https://oregon.public.law/statutes/ors_458.505

[7] Community Action Partnership of Oregon, Oregon's Anti-Poverty Network, CAPO website, 4th row, 3rd column (accessed Feb. 14, 2025); https://www.caporegon.org/find-help

[8] MWVCAA, Form 990 FY 2023, ProPublica, at 2, Part III, sec. 1 (May 13, 2024); https://projects.propublica.org/nonprofits/organizations/237056987/202441349349305799/full

Page 14 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

training, the opportunity to work, and the opportunity to live in decency and dignity."[9]

15. The formation of CAAs were authorized to "provide stimulation and incentive for urban and rural communities to mobilize their resources to combat poverty".[10] Due to the unique needs of local communities, CAAs were deemed to be more appropriate to address poverty than a one-size-fits-all approach of a federal agency.

16. The Omnibus Budget Reconciliation Act was passed in 1981, which among other endeavors consolidated programs from the EOA and established the Community Services Block Grant (CSBG) Program.[11] [12] The main purpose of the program is to:

---

[9] Economic Opportunity Act, Pub. L. No. 88-452, 78 Stat. 508, § 2, at 508 (Aug. 20, 1964); https://uscode.house.gov/statutes/pl/88/452.pdf

[10] Id, p. 516, Title II, Part A, Sec. 201.

[11] The Community Services Block Grant, National Community Action Foundation website; https://www.ncaf.org/csbg/

[12] Omnibus Budget Reconciliation Act, Pub. L. No. 97-35, 95 Stat. 357, at 511, Chapter 8, Sub-Chapter C, Subtitle B (Aug. 13, 1981); https://www.congress.gov/bill/97th-congress/house-bill/3982/text

17. "provide a range of services and activities having a measurable and potentially major impact on causes of poverty in the community or those areas of the community where poverty is a particularly acute problem".[13]

18. The Community Opportunities, Accountability, and Training and Educational Services (COATES) Act was passed in 1998 to:

19. "amend the Head Start Act, the Low-Income Home Energy Assistance Act of 1981, and the Community Services Block Grant Act to reauthorize and make improvements to those Acts, to establish demonstration projects that provide an opportunity for persons with limited means to accumulate assets, and for other purposes."[14]

20. Under the COATES Act, the purpose of the CSBG is:

---

[13] Id, sec. 675(c)(1)(A).

[14] Community Opportunities, Accountability, and Training and Educational Services Act of 1998, Pub. L. No. 105-285, 112 Stat. 2702, at 2702, cl. 1 (Oct. 27, 1998); https://www.congress.gov/105/plaws/publ285/PLAW-105publ285.pdf

21. "to provide assistance to States and local communities, working through a network of community action agencies and other neighborhood-based organizations, for the reduction of poverty, the revitalization of low-income communities, and the empowerment of low-income families and individuals in rural and urban areas to become fully self-sufficient".[15]

22. As mentioned earlier, dispersing to CAAs the CSBG and other

government programs and funding addressing poverty throughout Oregon

---

[15] Id, at 2728, Title II, Subtitle B, § 672(1).

Page 17 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

is managed by OHCS.[16][17] Those programs and funds are then coordinated by the 17 CAAs throughout the state, including Defendant.[18][19][20][21][22]

23. Oregon's Executive Order 23-02 was signed on January 10, 2023, declaring a state of emergency due to a significant shortage of housing and

---

[16] OHCS, OHCS Agency Structure, OHCS website, Housing Stabilization Division (accessed Feb. 13, 2025);

https://www.oregon.gov/ohcs/about-us/Pages/agency-divisions.aspx

[17] OHCS, Community Services Block Grant, OHCS website (accessed Feb. 13, 2025);

https://www.oregon.gov/ohcs/for-providers/Documents/factsheets/FACT SHEET-CSBG.pdf

[18] OHCS, Housing Stabilization Program Fact Sheet, OHCS website (accessed Feb. 13, 2025);

https://www.oregon.gov/ohcs/for-providers/Documents/factsheets/ FACTSHEET-HSP.pdf

[19] OHCS, Elderly Rental Assistance Program, OHCS website (accessed Feb. 13, 2025);

https://www.oregon.gov/ohcs/for-providers/Documents/factsheets/FACT SHEET-ERA.pdf

[20] OHCS, Emergency Housing Assistance Fact Sheet, OHCS website (Feb. 13, 2025);

https://www.oregon.gov/ohcs/for-providers/Documents/factsheets/FACT SHEET-EHA.pdf

Page 18 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

increases in unsheltered homelessness. The order was then extended in 2024 and 2025.[23] [24] Among other provisions, it directed OHCS to allocate up to $40-million appropriated to them for the 2021-2023 biennium to respond to the state of emergency.[25] The Marion and Polk counties Continuum of Care region-- the service area of Defendant-- was included in the state of emergency declaration due to an increase in unsheltered homelessness of 150% from 2017 to 2022.[26] [27]

---

[21] OHCS, Emergency Solutions Grant Fact Sheet, OHCS website (Feb. 13, 2025);
https://www.oregon.gov/ohcs/for-providers/Documents/factsheets/FACT SHEET-ESG.pdf

[22] OHCS, HOME Tenant Based Assistance Fact Sheet, OHCS website (Feb. 13, 2025);
https://www.oregon.gov/ohcs/for-providers/Documents/factsheets/FACTSHEET-HTBA.pdf

[23] Or. Exec. Order No. 24-02 (Jan. 9, 2024);
https://www.oregon.gov/gov/eo/eo-24-02.pdf

[24] Or. Exec. Order No. 25-01 (Jan. 7, 2025);
https://www.oregon.gov/gov/eo/eo-25-01.pdf

[25] Or. Exec. Order No. 23-02, at 4, § 2 (Jan. 10, 2023);
https://www.oregon.gov/gov/eo/eo-23-02.pdf

[26] Id, at 1-2, ¶ 3.

[27] Id, at 3, ¶ 4.

Page 19 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

24. Oregon's HB 5019 became effective on the 29th of March, 2024, allocating money from the General Fund to specified state agencies for certain purposes related to housing. Within that spending bill, $20,900,000 was allocated for the biennium ending June 30, 2023 to OHCS

25. "to increase shelter capacity and connections to shelter, support rapid rehousing initiatives, provide capacity support for culturally responsive organizations and provide sanitation services for communities in designated homelessness emergency areas, based on local plans submitted to the department."[28]

26. $64,300,000 was allocated for the biennium ending the 1st of July, 2023 to OHCS

27. "to increase shelter capacity and connections to shelter, support rapid rehousing initiatives, provide capacity support for culturally

---

[28] Or. H.B. 5019, 82d Legis. Assemb., Reg. Sess., § 4 (enrolled Mar. 29, 2023); https://olis.oregonlegislature.gov/liz/2023R1/Downloads/MeasureDocument/HB5019/Enrolled

Page 20 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

responsive organizations and provide sanitation services for communities in designated homelessness emergency areas, based on local plans submitted to the department."[29]

28. Oregon's SB 5701 became effective on the 17th of April, 2024, appropriating money from the General Fund to specified state agencies for biennial expenses. Within that spending bill, $39,000,000 was allocated for the biennium ending the 30th of June, 2025 to OHCS

29. "for deposit into the Long-Term Rent Assistance Fund established by ORS 458.392, for rental assistance, supportive services, outreach and other costs associated with rehousing people experiencing, or at risk of experiencing, homelessness."[30]

30. These funding sources are the basis for the Oregon Rehousing Initiative (ORI), a statewide program to rehouse and prevent

---

[29] Id., § 5.

[30] Or. S. B. 5701, 82d Legis. Assemb., Reg. Sess., § 36 (enrolled Apr. 17, 2024); https://olis.oregonlegislature.gov/liz/2024R1/Downloads/MeasureDocument/SB5701/Enrolled

Page 21 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

homelessness.[31] [32] It was formed in response to the state of emergency. Defendant operates a program based on ORI that accepts funding from it, called the Marion County Rapid Rehousing Program (MCRRP). Kaela Lombardi, Program Manager for the ARCHES Project (a subsidiary of Defendant) confirmed this over email.[33] In order to be part of the program, one must be a participant of their Transitional Shelter Program (TSP) staying at one of the shelters they operate, such as ARCHES Inn, ARCHES Lodge, or Salem Navigation Center. Plaintiff is a participant of the MCRRP and TSP at Salem Navigation Center.

31. The shelter serves the state's function of addressing the state of emergency. Not only does it house unsheltered individuals waiting to be pulled for permanent housing pursuant to the ORI and the MCRRP, it

---

[31] OAR-813-270-0020;
     https://secure.sos.state.or.us/oard/viewSingleRule.action?
     ruleVrsnRsn=319541

[32] OHCS, Oregon Rehousing Initiative Program Guidance Manual, at 4,
     art. 1 (updated May 2024);
     https://www.oregon.gov/ohcs/for-providers/Documents/Oregon%20Reho
     using%20Initiative_Program%20Guidance_May%202024.pdf

[33] Appendix 1 – Kasadu and Lombardi, Emails Between Blu and Kaela
     (Oct. 29, 2024).

Page 22 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

increases the capacity of available beds for unsheltered homeless individuals throughout the state by 75, and connects individuals with social services to stabilize their lives.[34] [35] [36] [37]

32. Three weeks following a city records request in April of 2023,

---

[34] Sheraz Sadiq, *New navigation center in Salem may help ease city's growing homelessness crisis*, Oregon Public Broadcasting (Apr. 3, 2023); https://www.opb.org/article/2023/03/31/think-out-loud-new-navigation-center-salem-oregon-homelessness-crisis/

[35] Whitney Woodworth, *Peek inside Salem's first homeless navigation center*, Statesman Journal (Apr. 14, 2023); https://www.statesmanjournal.com/story/news/local/2023/04/14/salems-first-ever-homeless-navigation-center-opens-doors/70112188007/

[36] Megan Allison, *New shelter space for Salem homeless set to open this spring*, KATU News (Apr. 16, 2023); https://katu.com/news/local/new-shelter-space-set-to-open-in-salem-this-spring-homeless-marion-county-oregon

[37] Abbey McDonald, *Yet to open, Salem's homeless navigation center could be out of money by 2025*, Salem Reporter (May 19, 2023); https://www.salemreporter.com/2023/05/19/yet-to-open-salems-homeless-navigation-center-could-be-out-of-money-by-2025/

33. "Salem […] released the city's 27-page contract with the Mid-Willamette Valley Community Action Agency to operate the navigation center and a spreadsheet showing funding sources through 2026".[38]

34. Because Defendant serves the traditionally government function of reducing and preventing poverty as a CAA, as well as addresses the state of emergency with the MCRRP and TSP at Salem Navigation Center, they generally qualify under the Public Function Test as a state actor and specifically in the operation of the MCRRP and TSP at Salem Navigation Center.

2. Nexus Test

35. The Nexus Test is used to determine if an entity is a state actor, based on whether they are in a joint enterprise with the government.[39] In addition to Defendant receiving resources from federal, state, and local government entities in exchange for delivering financial and support

---

[38] Id.

[39] Burton v. Wilmington Parking Authority, 365 U.S. 715 (1961);
    https://www.law.cornell.edu/supremecourt/text/365/715

Page 24 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

services to individuals experiencing poverty, City of Salem acted on the framework of the state of emergency to form a mutually beneficial joint enterprise with Defendant to launch the Salem Navigation Center. City of Salem owns and maintains the building and property, while Defendant operates the shelter's services. The building previously housed a Department of Human Services (DHS) office.

36. To initially launch the facility, Salem Navigation Center received:

- ○ $3-million in federal American Rescue Plan Act (ARPA) funds from City of Salem to acquire and renovate the facility;

- ○ $3-million in federal ARPA funds from Marion County to renovate the facility;

- ○ $3.2-million from OHCS for behavioral health services, facility renovations, and day-to-day operations;

- ○ $5-million from Oregon Department of Health Services (ODHS) for day-to-day operations; and

Page 25 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

○ $1.3-million in OHCS grant funds from MWVCAA.[40]

37. Out of $15.5-million to launch the shelter, the state directly provided 52% of funding, the county provided 19%, City of Salem provided 19%, and Defendant provided 8%. Over 90% of start-up costs were attributed to public entities. City of Salem also owns the property and building the shelter is housed in, and they maintain the premises while Defendant operates it.

38. Due to the close coordination and shared responsibility between Defendant and the government in addressing the state of emergency, implementing anti-poverty programs, and managing Salem Navigation Center, Defendant qualifies as a state actor under the Nexus Test.

---

[40] City of Salem, Salem Navigation Center, City of Salem website (accessed Feb. 14, 2025); https://www.cityofsalem.net/government/shaping-salem-s-future/housing-shelter/learn-about-city-efforts-to-address-homelessness/salem-navigation-center

Page 26 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

3. State Compulsion Test

39. The State Compulsion Test is used to determine if an entity is a state actor, based on whether the government has significant coercive power over the entity's operations, and/or has provided significant encouragement for the entity to pursue its operations.[41] The government has substantial coercive power over Defendant in regards to the operation of their company and the Salem Navigation Center. As mentioned earlier, there are laws authorizing CAAs as well as governing their structure and operations.

40. For instance, Defendant must have a community action board with one-third of its members consisting of public officials.[42] Defendant has a board of 13 members, of which 5 (or 38%) are public officials; Cathy Clark (Mayor of Keizer),

---

[41] Blum v. Yaretsky, 457 U.S. 991 (1982); https://www.law.cornell.edu/supremecourt/text/457/991

[42] ORS 458.505(4)(b)(A); https://oregon.public.law/statutes/ors_458.505

Page 27 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Eunice Kim (Long-Range Planning Manager for City of Salem's housing

production strategy),[43] Deanna Gwyn (Salem City Councilor, Ward 4),

Carlos Barrientos (Dallas City Councilor), and Frank Lonergan (Mayor of

Woodburn).[44] Additionally, Rudy Vigil was or is a Signals Intelligence

Analyst for the US Army.[45] Kevin Karvandi retired as Commander of Marion

County Sheriff's Office on the 29th of September, 2023.[46] Steve McCoid

---

[43] City of Salem, Contact, City of Salem website, Housing Production
   Strategy (accessed Feb. 15, 2025);
   https://www.cityofsalem.net/government/shaping-salem-s-future/housing
   -production-strategy

[44] MWVCAA, Board of Directors, MWVCAA website (accessed Feb. 15,
   2025); https://mwvcaa.org/about-us/board-of-directors/

[45] Vigil, Rudy Vigil's LinkedIn, LinkedIn website (accessed Feb. 15, 2025);
   https://www.linkedin.com/in/rudy-vigil-62587613b

[46] Parise, Please join us in congratulating Commander Kevin Karvandi on
   his retirement, Nextdoor (Oct. 3, 2023); https://nextdoor.com/agency-
   post/or/marion-county/marion-county-sheriffs-office/please-join-us-in-
   congratulating-commander-kevin-karvandi-on-his-retirement-295743258/

Page 28 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

was Salem City Councilor, Ward 4 between 2014-2019.[47][48] Although the afrementioned board members are not current public officials, their experience and presence on the board adds a layer of pressure for Defendant to act in the state's interests rather than independently of its own.

41. The grant agreements of the CSBG as well as other government funding allocations likely carry specific conditions grantees such as Defendant must adhere to, including constitutional requirements. Federal, state, and local government officers overseeing the drafting, approving, and signing of grant agreements and other contracts themselves operate under their oath of office to support the US and state constitutions, respectively. This includes: federal officers who oversaw contracts approving the ARPA

---

[47] Rose, Steve McCoid wins South Salem's Ward 4 seat, Statesman Journal (May 20, 2014); https://www.statesmanjournal.com/story/news/politics/elections/2014/05/21/ward-race-close-call/9363351/

[48] Bach, *Jackie Leung joins Salem City Council as third bridge debate, Costco appeal loom*, Statesman Journal (reprinted in Buckeyes Wire, Jan. 15, 2019); https://buckeyeswire.usatoday.com/story/news/2019/01/15/salem-city-council-costco-third-bridge-debate-jackie-leung/2572876002/

Page 29 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

funds and CSBG funds for state and local governments;[49] state officers of OHCS and ODHS who oversaw approving contracts to fund the MCRRP and Salem Navigation Center;[50] [51] officers of Marion County who oversaw approving contracts for funding the shelter;[52] and the City of Salem mayor, councilors, and officers who oversaw approving contracts with Defendant to operate the shelter.[53] [54] [55] Their oath restricts them to only support recipients of their resources so long as those recipients do not violate the constitutional rights of the employees, independent contractors, patrons, and/or clients subject to those resources. Otherwise, those public servants violate their oath to support the respective constitutions.

---

[49] 5 U.S.C. § 3331; https://www.law.cornell.edu/uscode/text/5/3331

[50] Or. Const. art. XV, § 3;
    https://www.oregonlegislature.gov/bills_laws/Pages/OrConst.aspx

[51] Or. Const. art. III, § 1.

[52] ORS 204.020(2); https://oregon.public.law/statutes/ors_204.020

[53] ORS 221.908; https://oregon.public.law/statutes/ors_221.908

[54] ORS 221.903; https://oregon.public.law/statutes/ors_221.903

[55] City of Salem, Oregon, Charter, pmbl. (effective Jan. 1, 2023);
    https://www.cityofsalem.net/government/laws-rules/city-charter

Page 30 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

42. Defendant must have agreed to preserve the constitutional rights of individuals such as Plaintiff in order to receive the resources from the government to operate the company, the MCRRP and TSP at Salem Navigation Center. Therefore, Defendant has either violated the conditions of their contracts by violating Plaintiff's constitutional rights, or the government failed to include constitutional requirements in their contracts with Defendant. Coercive power was present but was not executed successfully, if at all.

43. In addition to providing resources, the government has provided substantial encouragement for Defendant to operate the MCRRP and TSP at Salem Navigation Center. City of Salem Mayor Chris Hoy has spoken to reporters in the context of this encouragement, calling the shelter the "crown jewel" of the city and regarding the city themselves as being directly involved in the shelter's operations. An article published by Abbey McDonald of Salem Reporter illustrated his perspective.

44. "When asked why the city would open the center without identifying sustained funding, Mayor Chris Hoy said that they knew a funding search was part of the task going into the project.

45. 'Because we're in a humanitarian crisis. We have to do it. We didn't have a choice,' he said. 'People are dying in the streets. We can't let that go on.' "[56]

46. A transcript of an interview between Dave Miller of Oregon Public Broadcasting, Nicole Utz of Oregon Housing Authority, and Mayor Chris Hoy further demonstrates the city's support, where Mayor Chris Hoy said,

47. " 'The navigation center is really a temporary shelter whereas permanent supportive housing is just what it sounds like. It can be permanent, the people can live there forever and it's actual housing, whereas the navigation center is really the first step off of the street. It's the first step out of a tent. It's where we assess individuals. We figure out what it is that they're gonna need to be successful, whether that's getting into drug and alcohol treatment, mental health treatment, whether they have physical health issues, whatever it is that they need, That navigation center is the place.

---

[56] McDonald, *Yet to open, Salem's homeless navigation center could be out of money by 2025*, Salem Reporter (May 19, 2023); https://www.salemreporter.com/2023/05/19/yet-to-open-salems-homeless-navigation-center-could-be-out-of-money-by-2025/

48. It's a low barrier shelter where people can come and stay for a period of time, maybe up to 60, 90 days, while we're getting them ready to go off to their next place. Whether it's permanent supportive housing, whether it's an affordable housing unit, or whether it's a market rate unit at that point, it's whatever the individual needs. That's how we really try to address it, folks here as we figure out where each person is, we meet them where they're at, and we try to help them get to the next, more positive place.' "[57]

49. In an article by Whitney Woodworth of Statesman Journal, Mayor Chris Hoy is also quoted regarding the Salem Navigation Center.

50. " 'Low-barrier shelters are instrumental in solving this crisis, and we've been impatiently waiting for this to open,' Mayor Chris Hoy said. 'Before long, these 75 beds will be filled with folks who were previously on the streets. Imagine the difference this shelter will make in their lives.'

---

[57]Sadiq, *New navigation center in Salem may help ease city's growing homelessness crisis*, Oregon Public Broadcasting (Apr. 3, 2023); https://www.opb.org/article/2023/03/31/think-out-loud-new-navigation-center-salem-oregon-homelessness-crisis/

Page 33 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

51. He called the center [...] a 'crown jewel' among the new projects designed to help end homelessness."[58]

52. In addition to the encouragement given toward Defendant's operation of the MCRRP and TSP at Salem Navigation Center by Mayor Chris Hoy and the various public entities funding the shelter, the state provided encouragement for Defendant to perform as a CAA through the decisions of public officials on its board, and the state's structure of designating CAAs and integrating them as part of OHCS' anti-poverty programs. Operations that include applying Defendant's policies and procedures to clients and staff, such as Plaintiff, Vee, and other staff members.

53. In the consideration of the coercive power of the aforementioned public entities and officials to hold Defendant accountable for constitutional violations in the operation of the company and their programs at Salem Navigation Center, as well as their encouragement of Defendant's

---

[58] Woodworth, Whitney, *Peek inside Salem's first homeless navigation center*, Statesman Journal (Apr. 14, 2023); https://www.statesmanjournal.com/story/news/local/2023/04/14/salems-first-ever-homeless-navigation-center-opens-doors/70112188007/

Page 34 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

operations, Defendant qualifies as a state actor under the State Compulsion Test.

4. Entwinement Test

54. The Entwinement Test is used to determine if an entity is a state actor, based on whether the entity and the government's structure and/or operations are so closely intertwined that the actions of the entity can be attributed to the government.[59] With their designation as a CAA, Defendant's organizational structure and operations are designed to be integrated with federal and state resource delivery systems for local anti-poverty programs. As such, CAAs such as Defendant are an essential component of the government's effort to locally address the state of emergency as well as generally reduce and prevent poverty.

55. Over one-third of Defendant's board of directors consist of public officials. MCRRP is funded and governed by OHCS.[60] Greater than 90% of

---

[59] Brentwood Academy v. Tennessee Secondary School Athletic Assn., 531 U.S. 288 (2001); https://www.law.cornell.edu/supct/html/99-901.ZO.html
[60] OAR 813-270-0080;
https://secure.sos.state.or.us/oard/viewSingleRule.action;JSESSIONID

Page 35 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

funding to launch Salem Navigation Center was from government sources.

City of Salem owns and maintains the shelter, and they refer to themselves

as being part of the shelter as if it is their project. It is as if Defendant was

hired by the government to operate the MCRRP and TSP at Salem

Navigation Center.

56. Due to the pervasiveness of government involvement in the

operations and structure of Defendant, the MCRRP, and TSP at Salem

Navigation Center, Defendant qualifies as a state actor under the

Entwinement Test.

57. In the totality of the circumstances, Defendant is a state actor in

their operations generally and while operating the MCRRP and TSP

specifically. Therefore, this court has jurisdiction over this claim against

Defendant for deprivation of Plaintiff's civil rights.

_____

OARD=YaMgh-
bmQJvGJlIbPsToDeaPpx_v4L_snhgqqjCFuxOANxOxnkbz!-608281216?
ruleVrsnRsn=319547

Page 36 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

## 5. Right of Administrative Due Process

58. State actors, such as Defendant, is subject to due process protections under the 14th Amendment to the US Constitution in the administration of their services.[61] This requires them to act in a fair and just manner, to base their decisions on reason and evidence, to allow for a hearing wherein a recipient of services may dispute any decision to deprive them of those services, and to provide an appeal process for decisions made. A decision by Defendant to compel a client to sign a behavior modification contract must be an evidence-based disciplinary action, and not a decision made arbitrarily.[62]

## 6. Right of Association & Privacy

59. Plaintiff has a fundamental right to form intimate associations of friendships and romantic partners.[63] Additionally, he has a fundamental right

---

[61] Mathews v. Eldridge, 424 U.S. 319 (1976);
  https://www.law.cornell.edu/supremecourt/text/424/319

[62] West Coast Hotel Co. v. Parrish, 300 U.S. 379 (1937);
  https://www.law.cornell.edu/supremecourt/text/300/379

[63] Roberts v. U.S. Jaycees, 468 U.S. 609 (1984);
  https://www.law.cornell.edu/supremecourt/text/468/609

to a zone of privacy associated with his intimate associations.[64] These

rights are established penumbras under: the 1st Amendment right of free

speech and assembly; the 4th Amendment right to be secure in one's

person, houses, papers, and effects, against unreasonable searches and

seizures of their intimate associations; the unenumerated privacy rights of

the 9th Amendment, and the 14th Amendment protections classifying

Plaintiff's right to form and maintain intimate associations as well as his

right to the privacy of his intimate associations as fundamental rights

affording strict scrutiny under substantive due process.[65]

60. Forming an intimate association primarily involves socially and

emotionally connecting with an individual, the connection of which becomes

more complex and involved over time. It is a process of building trust

through social interactions such as communicating and receiving words of

affirmation, conducting and accepting acts of service, sending and

receiving gifts, spending quality time with an individual,

[64] Eisenstadt v. Baird, 405 U.S. 438 (1972);
   https://www.law.cornell.edu/supremecourt/text/405/438
[65] Legal Information Institute, Substantive Due Process,, Cornell Law
   School website (accessed Feb. 19, 2025);
   https://www.law.cornell.edu/wex/substantive_due_process

Page 38 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

and physical touch.[66] Plaintiff's right to privacy protects him from government intrusion on the private capacities of his pursuit to form and maintain intimate associations, such as his interactions with an individual beyond the public capacities of a company designated as a state actor. Although, there are narrow exceptions deemed compelling interests to regulating the formation and maintenance of intimate associations, such as prohibiting sexual contact in the workplace and excessive interaction that adversely impacts productivity.

61. The right to form intimate associations is less common in the legal system than protections of intimate associations already formed, but it is included within the protections for the reasons that follow. Protections for intimate associations already formed rely on a designation of social status in relation to another individual. They are either a friend, a family member, or a romantic partner largely because the other individual involved agrees. However, making such designation is not always so clearly defined or

---

[66] Davis, *What Are the 5 Love Languages? Definition and Examples*, Psychology Today (Sep. 28, 2020); https://www.psychologytoday.com/us/blog/click-here-happiness/202009/what-are-the-5-love-languages-definition-and-examples

Page 39 - COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

agreeable, and it does not take into account the importance of the essential steps to develop an intimate association.

62. It would not be reasonable for a citizen to only have protections for intimate associations already formed due to how dynamic social status can be among two individuals. They may start out as strangers before moving on to acquaintances. That status may evolve over time as they develop experiences and memories, both good and bad. Bad experiences can seem like they should be avoided, but being able and willing to resolve conflict between two people is a strong indicator of whether those people value each other, whether they will stick around through hard times, and whether they are willing to deal with the less desirable parts of each other. There may be phases where two individuals test one another to see where their limits are. Ultimately, the way in which they navigate the rollercoaster of human connection may support building trust with each other as they form an intimate association. During this process, their social status toward one another may change for better or worse.

63. At one point, they may consider themselves friends. Then an event occurs that causes distrust, and they become acquaintances for awhile before making amends. At which point, their friendship becomes

stronger than before the conflict. By only applying heightened protections when they consider themselves friends, their budding intimate association becomes more exposed to government intrusion when they have bad experiences that causes them to disengage. This does not appear just or fair since those bad experiences become essential to the strength of their intimate association.

64. When an individual is not ready to take a step forward in a personal connection or express their feelings toward another, it can build adverse social and emotional pressure for them to be placed in a situation where they are compelled to express whether they are in an intimate association with someone. People may be sensitive regarding their connections. They may not handle well being pushed to actively make a choice as to whether they are willing to enter into an intimate association, rather than passively existing in one. The term itself at face value alludes to a romantic gesture. Having The Court rely on an expression of one's social status to establish constitutional protections for the intimate association in controversy could potentially sabotage that association.

65. Relying on the testimony of two individuals to bring forward a claim for deprivation of the right of association is not compatible with the

Page 41 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

nation's democratic system of civil rights because it only recognizes individual rights, not collective rights. If the right of association means anything, it is the right of the individual to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to form an intimate association.[67] It does not account for whether the individual one has chosen to form an intimate association with agrees to also develop that connection, as the choice involves efforts to convince one another. They could still be considering their own decision.

66. Plaintiff perceives Vee as a friend, whom he admires and values. She is fun and engaging, intelligent, hard-working, attractive, and a fantastic artist. Beyond that, she has a unique personality that as a whole inspires Plaintiff to want to be in her sphere of influence. Although, he often struggles to talk to her out of nervousness, and that has been a contributing factor to their ability to connect. She seems to want to discover what kind of man Plaintiff is before making a decision whether to include him in her life on a long-term basis, but she still shares with him personal details of her life as though he is her friend. Vee tiptoes around the fraternization rules to

---

[67] Eisenstadt v. Baird, 405 U.S. 438 (1972);
https://www.law.cornell.edu/supremecourt/text/405/438

Page 42 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

engage with Plaintiff, while also maintaining the impression she is unwilling to break the rules to engage with him. For instance, she does not ask him any questions about his own life.

67. It has been a rollercoaster of an experience, trying to figure out how to connect with her without being in trouble with Defendant, which seems to have resulted in multiple moments of her integrating with him and disengaging. Plaintiff has always been interested in learning more about her, has given her space when she was upset with him, invited her to have coffee with him, asked for her number, given her gifts to help remind her he is a source of support, reassured her, and posted words of reassurance on his social media profile in the hopes she would see them. He has also made many mistakes over the last several months, such as words he has said without thinking that may have offended her, failed to carry conversations with her due to nervousness or drawing a blank, and missed nonverbal cues.

68. Even though an intimate association has not been recognized herein this case as being formed and complete, Plaintiff's acts-- whether a successful or failed attempt-- to form an intimate association with Vee and other staff members in the MCRRP and TSP at Salem Navigation Center

Page 43 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

as well as maintain the privacy rights of those acts are nonetheless protected fundamental rights. By exerting pressure on Plaintiff, Vee, and other staff members to refrain from social contact and personal connection with Plaintiff through those policies and procedures, Defendant deprived and compromised his ability to form intimate associations with them and maintain his privacy in relation to those connections.

7. Fraternization Policies

69. The policies in question principally involves the fraternization rules under Article "Social Conduct" Section Q and P on page 3 as well as Article XII Section B on page 11 of Defendant's Transitional Shelter Program Rules and Guidelines. Section Q states,

70. "Fraternization is defined as, but not limited to: sexual contact between staff and client; social contact between staff and client other than that scheduled by the program; or asking questions of a personal or sexual nature. Physical or intimate relations of a sexual nature between the following are strictly prohibited:

- Clients and staff
- Clients and clients"[68]

71. Section P states,

72. "Tips, gifts or business transactions between clients and staff are not permitted, including but not limited to the following:

- The lending or borrowing of money, regardless of the amount
- The payment for services, such as washing cars, working around staff members' homes, etc.
- The selling of items between clients and staff."[69]

73. Section B states,

74. "Fraternization includes but not limited to:

- Sexual contact;
- Social contact other than that scheduled by the program;
- Asking questions of a personal or sexual nature;

---

[68] Appendix 2 - MWVCAA, Transitional Shelter Rules and Guidelines, at 3, Article Social Conduct, Section Q (Aug. 2023).

[69] Id, Section P.

Page 45 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

- Excessive familiarity; and
- Ongoing business relationships."[70]

75. The language in particular adversely impacting Plaintiff's rights are those defining fraternization as social contact between a staff member and client other than that scheduled by the program, asking questions of a personal nature, and excessive familiarity. That language effectively prohibits Plaintiff from acting to form a friendship or romantic partnership with Vee and/or other staff members while in the MCRRP and TSP at Salem Navigation Center. Otherwise, disciplinary action may result such as a write-up, temporary trespass, or a complete exit from the MCRRP and TSP. The policies also compromise his ability to form a friendship or romantic partnership with them because they are required by Defendant's policies to reject Plaintiff's attempts at connecting meaningfully with them in order to preserve their job. Defendant did not have jurisdiction to apply those policies or to offer Plaintiff participation in the MCRRP and TSP in exchange for waiving Plaintiff's rights in the agreement of his

---

[70] Id, at 11, Article XII, Section B.

Page 46 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

understanding and adherence of the policies and procedures subject to him while a member of the program.[71]

76. There are likely other policies as well that reflect fraternization rules beyond the Transitional Shelter Rules and Guidelines, such as employee policies and procedures. However, staff members at Salem Navigation Center were either unable or unwilling to furnish a copy to Plaintiff to analyze those rules.

8. Restricting Personal Connections

77. The primary events giving rise to this claim occurred at Salem Navigation Center in Salem, Oregon, and the date and approximate time occurred within the time-frame of November 2024 - 11th of February, 2025. Although, the fraternization policies have been in effect on Plaintiff starting around the 27th of November, 2023 up to the present day. There was a specific incident that occurred near the entrance of the shelter on the 10th of February, 2025 at or around 6:00 PM, as well as two incidents the

---

[71] Appendix 3 – Kasadu and Morales, Policy Acknowledgement & Agreements (Nov. 29, 2023).

Page 47 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

following day in the morning and afternoon respectively around the premises of the shelter.

78. Vee was Plaintiff's case manager at Salem Navigation Center for several months before November 2024. During that time, he developed a personal interest in her. However, she has not been his case manager since either September or October 2024, so he is no longer under her supervision or decision-making authority.

79. Plaintiff is nonetheless prohibited from expressing his personal interest toward Vee or engaging in any meaningful personal connection with her. This includes actions such as asking her personal questions, giving her gifts, and spending time with her outside of the shelter setting.

80. In order to preserve her job, Vee is required to reject Plaintiff, ignore him, and dismiss him, especially when he attempts to build a personal connection with her. Plaintiff cannot determine with confidence whether her rejections are a genuine reflection of her feelings, or if they are actions directly inspired by concern that she may have her employment terminated by reciprocating his attempts to connect with her.

81. In Plaintiff's perspective, Vee has projected mixed messages toward him reflecting mixed feelings, as if she has entertained the idea of

Page 48 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

developing a personal interest in him but that she is still processing

personal matters in her life and is more concerned about being terminated

from her job as Case Manager.

82. It is possible Vee's bosses-- Kimberly Carpenter and Zachary

Diaz-- could be approaching her with an ultimatum to shut down her

feelings and reject Plaintiff or be terminated. She seems to act differently

towards Plaintiff when she is not around her bosses. When they are

around, she is rather stand-off-ish and dismissive of him, such as avoiding

eye contact and conversations with him. Sometimes, even projecting that

she outright dislikes him. At other times when her bosses are not around,

she has warmer relations toward Plaintiff, maintains eye contact, and is

generally more open to conversing with him about her personal life.


9. Valentine's Gifts

83. For instance, on the evening of the 10th of February, 2025 at or

around 6:00 PM, Plaintiff approached Vee to ask if she would play

Superfight with him (a card game). She rejected his invitation, stating she

was about to leave for the night. He then asked her if he could talk with her

outside the building before she left for the evening. It was assumed her

bosses had gone home for the day. She accepted, and the two went outside in the area of the entrance to talk. At first, she thought he had a problem with another client, and she wanted to wait until the following day to talk about it. Plaintiff told her he had something for her for Valentine's Day. She smiled and seemed enthusiastic about it, asking what it was. He brought out from his pocket a red rose head that had been preserved and housed in a clear plastic case formed like a faceted crystal box. She seemed interested, smelling it, feeling it, and pondering on how it was preserved.

84. Plaintiff then brought out a small black velvet bag with a blue sandstone worry stone in it. She took it out and observed it for some time, noticing how it sparkled and telling him something along the lines of that giving her stones was a good idea. Her words implied she liked receiving them and that if Plaintiff was going to give her another gift in the future that she recommended gemstones. Additionally, she told him she put the rose quartz worry stone he previously gave her on her new lamp and that he should see it sometime, implying that he should visit her office at some point in the future.

85. Plaintiff then pulled out a Taco Bell sauce packet with the words "I Like [blank]" on it, with "You" and a heart written in pen on the blank spot, completing the phrase "I Like You" with a heart. Vee mentioned that when he previously gave her a Taco Bell sauce packet a few days previously (that had "You're Cute!" printed on it), she had trouble reading it at first because he put it on the box she was carrying. It must have fallen before she could make out what it said. Although when he approached her during lunch that day to tell her he did not mean it as a jab, she ignored him. He assumed it was because she was standing next to Kim while serving lunch and did not want to be in trouble for making social contact with him.

86. Vee conveyed that she appreciated the Valentine's gifts. Plaintiff responded by stating he appreciated her. Then she talked about how she would be moving to Washington County at the end of the month and that if Defendant could not hire Case Managers who were willing to work at Salem Navigation Center, she would be quitting because of an overwhelming case load and that it would be an hour drive. He told her that it is not too bad (of a distance), implying he would have no trouble making the effort to visit her. Then he asked her if he could have her number before she left her job. She agreed to give it to him when she leaves, implying she

could not do so while she worked there. Plaintiff asked if she would stay if he found someone to hire by the end of the month. She gave a firm yes. He asked her if he would see her tomorrow, and she told him she would be in at 7:00 AM the following day. They parted ways, and he told her to be safe.

87. No where within the interaction did Plaintiff have the impression Vee felt nervous, uncomfortable, shameful, guilty, frustrated, or agitated. She did not appear to be lying to avoid rejecting him or in a hurry to leave. Neither did she appear averted by Plaintiff's effort to share his gifts or to chat with her in any way. During the interaction, her voice was steady and casual. She generally looked him in the eyes without fear when speaking. Her facial expressions were not showing signs of adverse reactions, and she did not shift in any uncomfortable way. Neither of her feet were pointed towards the path to her vehicle, which may have suggested her desire to leave the interaction. She did not make any excuses to leave shortly after receiving the gifts. Instead, Vee projected that she was genuinely invested in reassuring Plaintiff that his gifts were appreciated by her. She articulated personal details in connection to each gift such as her preference for gemstones, and that he should see in her office where she placed the other stone he gave her. Additionally, she stayed longer to connect with him after

Page 52 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

receiving the gifts, warning him of big changes in her life potentially

happening in the near future that could adversely impact their ability to

connect.

10. Morning Aversion

88. The morning of the 11th of February, 2025 around 9:00 – 11:00

AM, Plaintiff was finishing his walk around the block when he noticed Vee

loitering outside with Kim. She seemed stand-off-ish towards him as usual

around her bosses, averting her eyes to the ground when she saw him

walk up. Plaintiff informed Vee that he would be applying to the Case

Manager position, and asked her what she thought about it. He had spent

the previous evening and that morning, gathering signatures to use as

references and he was excited to tell her. She conveyed that she would

think he would want to be away from the shelter when he can. Her tone and

body language gave Plaintiff the impression she felt defeated or otherwise

frustrated. She was looking at the ground with a frown, her hands in her

pockets, clearing pine needles from the sidewalk with her shoe as if

distracted or lost in thought.

89. Kim told Plaintiff she talked to Zach about hiring him, who told her that Plaintiff would likely not be eligible for hire since he stays at the center and would have to wait six months before being eligible for hire after leaving. Plaintiff told Kim he would try requesting an exemption with the higher-ups. She asked him what was going on with the MCRRP. He responded that they were waiting on him.

90. Plaintiff needs to file a civil complaint in county court to discover why certain funds within the MCRRP are no longer available. The answers he had been given were inadequate, and the grievance and appeals filed within the company were denied. Additionally, Plaintiff has been working on appealing other cases that take precedence.

91. In response to asking again what Vee thought about Plaintiff applying for the Case Manager position, Kim mentioned Vee would not be a decision-maker in hiring him. He told Kim it was not about her being a decision-maker, but what she thought about the idea personally. Vee did not respond, and instead was still shifting pine needles with her shoe. Kimberly either asked if Vee wanted to talk to Zach or if she was ready to talk to him. Vee again did not respond, but continued clearing pine needles from the sidewalk. There was a bit of a pause before Kim said to her that

Page 54 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

she was waiting on her, and Vee slowly made her way to the door to return

back into the shelter. It was as if Vee did not want to return to the building,

and that she was still trying to rationalize with something in her mind or

delay a task she did not want to do. Perhaps she did not want to go through

with talking to Zach.

11. The Meeting

92. Later that day-- potentially around 3:00 PM-- Plaintiff was

approached by Kim at the shelter, who asked if he had time to talk. He

followed her to the conference room just south of the building's lobby,

where Zach was sitting at a table. Plaintiff sat down, and Kim closed the

door.

93. There were pictures of the gifts Plaintiff had given Vee printed out

on computer paper and laid out on the table. Plaintiff could tell they were

taken by Vee on account of her hands holding the gifts in the pictures. It

seemed as if she took the pictures in her car after receiving them, and sent

them to someone by text message. The background of the pictures

appeared to be the inside of a vehicle, and the lighting gave the impression

it was dark outside. Plaintiff did not see copies of any text messages

corresponding to the pictures, so it could not be determined under what premise her bosses obtained those pictures. Kim and Zach informed Plaintiff that Vee felt uncomfortable about receiving the gifts, and that it needed to stop. Zach conveyed he knew about the Taco Bell sauce packet with "You're Cute!" printed on it, and Plaintiff's offer to help Vee with food stamps. In those instances, Kim was present.

94. Kim and Zach brought up a note Plaintiff had given Vee before, which they had to talk to him about at the time because Vee did not appreciate it due to personal matters Plaintiff brought up in the note that he was not aware at the time he should not have brought up. Several months had passed since that incident, which occurred probably around September or October of 2024. It prompted her to be removed as his case manager. Within that time and the 10th of February, 2025, Vee had slowly become amicable again after a period of aversion towards Plaintiff.

95. Plaintiff was informed at the meeting with Kim and Zach that Vee could lose her job as a result of connecting with him on a personal level, implying that violating the fraternization policies could cause her termination. Kim gave an example that someone once asked for Kim's phone number and if she had given out her number, she could have been

fired. Zach and Kim downplayed an interaction Plaintiff perceived as a hint, where during conversation he told Vee to let him know if she needed anything and as she walked away, she gave him a smile that seemed to project she may have an interest in him.

96. Plaintiff requested Vee to be in the room while having the meeting. She entered the room after some time, sat between them, and proceeded to explain how she has trauma from rejecting people who in the past have retaliate against her in response. This apparently causes Vee to have trouble saying no to people, including Plaintiff. She noted how she did not want to be rude when he gave her the gifts, that her job was at stake, that she likes to keep her personal and professional lives separate, that she had no romantic intentions with Plaintiff, and that he knows what she is going through in relation to not being ready to be in a relationship. Plaintiff conveyed he was not trying to be in a relationship with her at that time, but that he had the impression she was interested in him and that he felt their connection was heading in that direction. Against his better judgment, Plaintiff asked if her feelings would change if he left the shelter. She confirmed it would not. Kim looked at Zach with a sneer, asking if that made them uncomfortable. It was as if Kim had made the statement to inspire

Page 57 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

them to agree with her. No one responded. Vee asked how she was giving

Plaintiff the impression she had feelings for him. He provided the same

example as he gave Kim and Zach. She did not respond. After she left the

room, Plaintiff was placed on a behavior modification contract (basically a

write-up). They asked what he could do to make sure it did not happen

again, and what they could do to help him. Plaintiff responded by stating he

was shutting down at the moment, that he just hurt himself a lot, and that

he needed to sit with it for awhile. Then he left the room. It was later

determined that Zach had added onto the contract that Plaintiff had

conducted an act of sexual harassment in addition to giving a staff member

an unwanted gift.[72]

97. Due to the interactions between Vee and Plaintiff over the past 4-5

months in relation to the meeting and its location, he cannot determine with

confidence whether she was being fully honest in the meeting. If she was

not, then she may have been compelled to lie to preserve her job, and/or

was not ready to express what she felt about him beyond subtle hints of

personal interest spread about the last several months. The majority of

---

[72] Appendix 4 – Kasadu and Diaz, Behavior Modification Contract,
    MWVCAA (Feb. 11, 2025).

Page 58 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

those hints are not discussed herein this complaint, as hints of interest in general are performed in ways that are easy to discredit.

98. Her statement at the meeting that she had difficulty rejecting Plaintiff due to trauma seems unfounded. She has a strong personality, and has had plenty of practice in the past rejecting Plaintiff while her bosses were around. Vee rejected Plaintiff's request to play Superfight with him within moments of asking her if he could talk with her outside, wherein he gave her the Valentine's gifts. He certainly felt rejected when she removed herself as his case manager several months ago. Each time, Plaintiff did not retaliate.

99. In fact, when she could not make it to work on a day she agreed to play Superfight with him, he followed up in a calm and nonchalant manner, telling her to let him know next time she could not make it so he would not be waiting around for her. Then he offered his food stamp card to her, thinking her hours had been cut and she needed some form of extra funding since she made too much to qualify for benefits. Vee rejected that offer without any retaliation from Plaintiff, letting him know he misunderstood her circumstance at the time.

100. The conference room where the meeting was held has a camera in it where management in the company were able to observe and record the meeting. There are multiple cameras inside and outside the building. Vee was sitting with her bosses at both sides of her. She may have continued her usual facade in front of them and/or she may have been pressured by them to shut down Plaintiff to ensure she was not terminated for any suspected fraternization. The video recording of the meeting could be used as evidence in the event one of the bosses questioned whether Vee was fraternizing with Plaintiff.

101. Vee's bosses may have noticed that for a few days prior to giving her the Valentine's gifts, Plaintiff was sitting in the lobby of the shelter with his laptop, as opposed to his usual spot. He wanted more opportunities to interact with her, so he sat in a spot he would not be in sight of her vehicle (so as not to appear creepy or possessive). He also felt guilty for ignoring her telling him "bye" the previous day thinking she was on the phone, so he tried to make up for it by sitting near where they were when he ignored her to convey she had his attention. She did not seem to mind that at all, and they did have a few amicable interactions.

102. It is possible Vee's bosses anticipated Plaintiff giving her a Valentine's gift on account of him sitting in the lobby. They may have told her and others to report any gift-giving around Valentine's Day. She could have been excited to tell someone about her new gifts and told Kim, who may have then reported it to Zach. Someone may have been watching the cameras and listening to the audio when Plaintiff asked her to chat outside, where he gave her the gifts. There is a camera in the lobby, as well as a camera within a yard or so of where they had the conversation. They are capable of recording audio. Whoever may have been watching the cameras may have contacted Vee shortly after Plaintiff gave her the gifts, telling her to send them pictures of the gifts and pressuring her to reject Plaintiff using the camera feed as leverage. Kim mentioned she could not personally fraternize with others. Perhaps she perceives it to be unfair for Vee to be able to. The statements made by Vee at the meeting appeared to be a reflection of stereotypical professional boundaries, as if she was regurgitating what her bosses wanted her to say, or what she thought they wanted to hear.

103. It could be that pressuring Vee to reject Plaintiff is a means to push him out to permanent housing, since Defendant's MCRRP contacted

Page 61 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

him on the 6th of February, 2025, pressuring him to search for permanent

housing to move into.[73] Plaintiff stood against their pressure, stating he had

cases he needed to work on before moving forward with the civil claim for

the funding conflicts in their program and the fraternization rules. The

claims against Defendant need to be resolved before he can continue to

participate in the MCRRP. One involves funding that is not being allocated

to him for housing and supportive services, and the other is the claim

herein. Plaintiff conveyed he was willing to contact them every 30 days to

provide updates on his progress. They stated he had until the end of the

month to participate-- look for housing-- or they would have to exit him from

the MCRRP. Plaintiff rebuttaled by stating he would have to file another civil

claim to be placed back on the program due to them violating

administrative due process under the 14th Amendment as state actors,

since they were presenting him with an unfair process.

104. Sexual harassment was not discussed at the meeting. Neither

was there any sexual connotation involved in giving Vee the gifts. Plaintiff

does not believe she was aware he was being placed on a behavior

modification contract for that reason. He believes it was an attempt by Zach

---

[73] Appendix 5 – Emails Between Mike, Kaela, and Blu (Feb. 6-7, 2025).

Page 62 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

and/or Kim to control Plaintiff's behavior from any future interactions with

Vee, and/or to pressure him to pursue housing instead of staying at the

Salem Navigation Center while working through his legal cases.

105. Either of these scenarios would explain Vee's demeanor and

reactions when she was given her Valentine's gifts, her frustrated

demeanor the following morning, and her attitude changes in relation to the

presence of her bosses over the last several months. She may be trying to

balance and rationalize with the personal matters causing her aversion to

romance, preservation of her job, and a secret but sprouting radicle of

interest in Plaintiff. Meanwhile, her bosses are certainly intolerant of

fraternization and may be overly cautious of a personal connection

between Vee and Plaintiff, thereby inspiring them monitor Vee and Plaintiff.

106. Nonetheless, the fraternization rules are contributing to a

colossal rift between Vee and Plaintiff. It attempts to justify Defendant

disciplining them for having social contact and developing a personal

connection with one another, regardless if it amounts to a friendship or

something more. The policies compromise Plaintiff's ability to make the

effort to form an intimate association with Vee, such as sharing social

interactions with her, exchanging personal questions with one another,

giving and receiving each other's gifts, exchanging personal phone numbers, and inviting one another to have coffee, tea, or beer outside the shelter setting. She is required as part of her job to reject his social interactions with her, thereby negating any progress in his efforts before he has a genuine opportunity. She does not even appear comfortable looking him in the eye when her bosses are around.

107. The fraternization policies applied by Defendant in the operation of the MCRRP and TSP at Salem Navigation Center therefore violates Plaintiff's fundamental right to form an intimate association with Vee-- wherein he seeks to be her friend or romantic partner-- as well as his right to privacy regarding such formation of association. The personal connection between him and Vee as well as any efforts either of them make to develop that connection is not within Defendant's jurisdiction to prohibit, regulate, or to compel disclosure of, with the exception of narrowly tailored circumstances explained herein this complaint. Neither can they prohibit Plaintiff and Vee from having personal contact outside of the shelter location and beyond work hours.

## 12. Other Staff Members

108. Defendant's fraternization policies also prohibit Plaintiff from attempting to form intimate associations with other staff members, such as Ryan, Dominic, Justin, and Valerie. For instance, Plaintiff would like to meet with them outside of the shelter setting and perhaps have coffee, tea, or a beer together. However, he is prohibited from visiting with them outside the shelter setting without the threat of them being terminated from their job and Plaintiff being exited from the shelter.

109. Generally, Plaintiff cannot effectively connect with staff members at the shelter in a meaningful way without being able to have social contact outside of what is scheduled or to ask them personal questions. It is as though he is required by Defendant's fraternization policies to be socially isolated from staff members while participating in the MCRRP and TSP at Salem Navigation Center. The only way Plaintiff can obtain their contact information is within a narrow scope of time as he transitions out of the shelter. That is not an efficient or guaranteed means of maintaining contact with those people. Building a personal connection with an individual leading up to them becoming comfortable with Plaintiff having their contact information takes time, and the necessary social conduct is not allowed at

Page 65 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

the shelter. Such a personal connection could not reasonably be developed within the narrow window of time Plaintiff is transitioning out of the shelter.

110. The fraternization rules therefore violate Plaintiff's right to form friendships with Ryan, Dominic, Justin, and Valerie by having social contact with them, exchanging personal questions with one another, and generally visiting with them outside the shelter setting. The right to privacy of his attempts to form such associations was also violated, as Defendant attempted to prohibit them from having personal contact outside of the shelter location and beyond work hours.

<u>13. State's Interest</u>

111. Substantive due process applies heightened protection from deprivation of certain rights deemed fundamental to our society.[74] [75] [76] [77] These protections require the government to prove a compelling reason exists to justify depriving an individual of their fundamental rights. The means of deprivation must be narrowly tailored to a compelling reason by the state, and be the least restrictive available option of depriving the right in controversy.

112. Defendant may bring forward several arguments conveying that the state has a compelling interest to allow the fraternization rules to stand. Potential arguments will be explored herein this section.

113. First, the state does not have a compelling reason to apply their fraternization rules to prohibit Plaintiff from forming an intimate association

---

[74] Meyer v. Nebraska, 262 U.S. 390 (1923);
    https://www.law.cornell.edu/supremecourt/text/262/390
[75] Griswold v Connecticut 381 U.S. 479 (1965);
    https://www.law.cornell.edu/supremecourt/text/381/479
[76] Benton v. Maryland, 395 U.S. 784 (1969);
    https://www.law.cornell.edu/supremecourt/text/395/784
[77] Obergefell v. Hodges, 576 U.S. 644 (2015);
    https://www.law.cornell.edu/supremecourt/text/14-556

with Vee on the basis of nepotism because she has no supervisory or decision-making authority over him as she is no longer his case manager. If she was his case manager, Defendant could allow Plaintiff to switch case managers with another client or be added on to the case load of another case manager.

114. Defendant does not have a compelling reason to apply their fraternization rules to prohibit Plaintiff from forming an intimate association with Ryan, Dominic, Justin, or Valerie on the basis of nepotism because their jobs as site assistants are more of an advisory position over clients rather than one that is disciplinary. They can assist clients with de-escalating highly charged conflicts, but decisions on disciplinary actions are ultimately the responsibility of case managers. Therefore, they have no inherent supervisory or decision-making power over clients.

115. The potential for conflict is not a compelling interest for the state to prohibit fraternization at Salem Navigation Center. Any conflict that may arise from an intimate association between Plaintiff and Vee or other staff members could be handled on a case-by-case basis, primarily between them personally. If Defendant must become involved due to significant disruptions in the orderly pursuit of their goals in the MCRRP or TSP at

Page 68 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Salem Navigation Center, the subject matter would involve the disruption rather than the intimate association. They can issue verbal warnings, compel mediation in the company, implement behavior modifications, and/or compel attendance in mental health counseling. Salem Navigation Center has an on-site mental health counselor available, and other case managers and program managers can assist with mediating conflicts between individuals who cannot resolve it themselves.

116. Defendant has demonstrated on the 11th of February, 2025 that they can organize mediation sessions between Plaintiff and Vee in the event a conflict arises from an intimate association they could not resolve on their own at Salem Navigation Center. These measures are no different than an employee and/or client having unresolved conflict with another at the shelter, generally. Fraternization rules are not required in order to execute those measures, and they can be requested or prompted based on need and availability. If a conflict was truly unresolvable after taking the aforementioned measures and it persisted in creating a hostile environment, Plaintiff, Vee, and/or other staff members could be moved to another transitional shelter facility operated by Defendant, such as

ARCHES Inn.[78] The worst case scenario being termination from their job or Plaintiff being exited from the MCRRP and TSP.

117. A trauma-informed care organizational model that recommends deterring fraternization is not a compelling interest for Defendant to restrict Plaintiff's right to form intimate associations with Vee and other staff members. That would imply that abstaining from developing personal relations is necessary to reduce the risk of adversely impacting Plaintiff's or Vee's psychological health as they recover from a diagnosed mental illness. There is no record from a licensed psychiatrist or psychologist diagnosing Plaintiff with a mental illness, nor any recommendation from one specifying that Plaintiff should for health concerns refrain from social contact and forming intimate associations with staff members.

118. Vee's statement at the meeting regarding her having trauma and being unable to reject people is not compelling enough to justify fraternization rules. This is not to disregard any trauma she may have, and Plaintiff herein emphasizes that he cares about her well-being. However, she has on multiple occasions rejected Plaintiff, so it appears she does not

---

[78] MWVCAA, ARCHES Inn Renovation, MWVCAA website (accessed Feb. 17, 2025); https://mwvcaa.org/projects/arches-inn-renovation/

Page 70 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

experience trauma symptoms when rejecting him. After being at the shelter for over a year and having her as his case manager for several months, she should know by now that Plaintiff is not someone who would bring harm to her.

119. Beyond Plaintiff, it is simply human nature to connect, so it would be common for her to be presented with situations where she would have to make a choice to agree or reject an invitation of some sort. She is a unique and attractive individual. It is likely there will be people she meets from all walks of life, who may want to be in her sphere of influence for one reason or another. As a case manager, meeting new people is extremely common. Rejecting someone and preparing for ways to handle any retaliation is a skill she needs to have as part of her job, or else she places herself at risk of harm; not the absence of fraternization rules.

120. If the fraternization rules were not in place and she had trouble rejecting someone, she could still request assistance from her bosses or another employee to inform the individual not to have social contact with her in the ways that make her uncomfortable. In the absence of being able to use the fraternization rules as an excuse to reject someone, she could

pivot to saying she keeps her personal and professional lives separate, just as she mentioned at the meeting.

121. The discrepency in the present matter is that she may have been compelled by the fraternization rules and pressure from her bosses to maintain face by lying, seeing no other option at the time. That could have been what she was pondering while moving the pine needles with her shoe, and it explains her conflicting behavior over the last several months. Making the claim that she has trauma associated with rejecting people would be a good cover in response to her bosses catching her accepting Plaintiff's gifts and offering reassurance that they were appreciated. Either that, or it would be a good cover if her bosses compelled her to make that statement, since it would ordinarily discredit Plaintiff's and anyone else's perception of fraternization that may have occurred thus far between him and Vee. Nevertheless, her statements at the meeting carries significant doubt, and they do not establish a compelling reason to apply fraternization rules at Salem Navigation Center.

122. Defendant may argue that Plaintiff's unhoused status is indicative of psychological vulnerability that carries a significant risk of leading to an unhealthy relationship with Vee and other staff members. That would be

Page 72 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

speculative, and relies on a licensed psychiatrist or psychologist to spend time analyzing the psychological health of Plaintiff while in an unhoused condition. In which point, they would likely pass their recommendations to Plaintiff to give to his case manager so they can facilitate trauma-informed care. There is no such record.

123. Defendant may argue that the efficiency of labor is a compelling reason to deter social contact and fraternization, as though spending time socializing in a personal fashion reduces work productivity. However, workplace relationships and the social interactions therein have been shown to improve well-being, job satisfaction, and job performance.[79] Well-being has been shown to improve work productivity.[80] Social interaction has been shown to improve both learning and teaching, skills that are essential to job performance.[81] Low social support has been shown to contribute to

---

[79] Birmingham et al., Social Connections in the Workplace, 38 American Journal of Health Promotion 886-891 (2024); https://journals.sagepub.com/doi/epub/10.1177/08901171241255204b

[80] Sachs et al., *Global Happiness and Wellbeing Policy Report*, at 73-94, Chptr. 5, Employee Well-being, Productivity, and Firm Performance: Evidence and Case Studies (2019); https://s3.amazonaws.com/ghwbpr-2019/UAE/GHWPR19.pdf

[81] Hurst et al., *The impact of social interaction on student learning*, 52

Page 73 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

adverse mental health outcomes, such as depression and anxiety.[82]

Symptoms of depression and anxiety have been shown to contribute to

losses in work productivity.[83] Also, Plaintiff and Vee or other staff members

connecting outside of work hours would have no inherent impact on

productivity during work hours, yet the fraternization rules prohibit it

anyway.

    124. Defendant may argue that staff members already have

opportunities for social interaction and support among other employees, so

forming personal connections with clients is unnecessary or would lead to

---

Reading Horizons 375 (2013);

   https://bearworks.missouristate.edu/cgi/viewcontent.cgi?

   article=1022&context=articles-coe

[82] P.J. Wickramaratne et al., Social Connectedness as a Determinant of

   Mental Health: A Scoping Review, 17 PLOS ONE e0275611

   (Oct. 13, 2022);

   https://pmc.ncbi.nlm.nih.gov/articles/PMC9560615/pdf/pone.0275004.pd

   f

[83] Oliveira, *The Role of Mental Health on Workplace Productivity: A Critical*

   *Review of the Literature*, 21 Applied Health Economics and Health Policy

   167–193 (Nov. 15, 2022);

   https://pmc.ncbi.nlm.nih.gov/articles/PMC9663290/pdf/40258_2022_Arti

   cle_761.pdf

Page 74 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

productivity losses. However, the more diverse an individual's social portfolio is, the more likely they are to have a healthy well-being.[84] Connecting with other clients at Salem Navigation Center may result in a staff member experiencing a safer work environment, since they would be able to better anticipate the client's behavior and motivations than if they did not form a connection with them. Additionally, connecting with clients on a personal level may allow staff members to discover more about how they can meet their needs. Even if the staff member is not a client's case manager, they can still assist informing other staff members about the client based on their interactions so that they can collectively anticipate the client and their needs. Personal connections with clients may then improve productivity rather than reduce it and overall result in a safer work environment, even if subjectively.

125. Defendant may argue there is no time for Plaintiff and Vee or another staff member to have social contact. However, social contact is

---

[84] Collins et al., *Relational diversity in social portfolios predicts well-being*, 119 PNAS e2120668119 (Oct. 17, 2022); https://www.hbs.edu/ris/Publication%20Files/Relational%20Diversity%20 in%20Social%20Portfolios%20Predicts%20Well%20Being_d606bf1c-4c 59-411c-84f0-f8dca0cebcad.pdf

Page 75 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

common in the workplace due to proximity and the demand of moving about the shelter whenever necessary. One may notice after spending a few days at the Salem Navigation Center that social interactions between staff members or staff members and clients is a common occurrence. It creates an environment of livability, of belonging and safety. Clients are expected to trust staff members to facilitate a safe environment. It would be reasonable to presume staff members would need to socially connect with clients on a personal level to make them feel safe.

126. Staff members working long hours in an office such as in Vee's position as case manager should certainly stand up and take a walk around every once in awhile, or there may be reductions in productivity due to depression, anxiety, and/or overall stress. Staff members are known to stand outside to smoke or catch some fresh air. They may pass through the halls, and take a moment to spark up a quick conversation before continuing with their work. There are plenty of opportunities for Plaintiff and Vee or other staff members to have social interactions in-between tasks. Even if there was absolutely no time available during work hours, it does not excuse Defendant from prohibiting Plaintiff, Vee, and other staff

Page 76 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

members from forming intimate associations with one another outside of work hours.

127. Overall, the state's interest in prohibiting social contact and intimate associations between clients and staff members such as Plaintiff, Vee, and other staff members is not compelling enough to justify Defendant's prohibition of their right to form intimate associations with one another while participating in the MCRRP and TSP at Salem Navigation Center. Defendant's fraternization rules too broadly restricts individuals who have no supervisory or decision-making authority at work, and who have not been diagnosed with post-traumatic stress disorder or other mental health conditions in such a way as to necessitate refraining from forming intimate associations at Salem Navigation Center. Social contact is not likely to inherently adversely impact psychological health or productivity, but may improve them. The way in which an employee and client manages their time and potential conflicts within the intimate association would be a stronger indicator whether the social contact has any adverse impact on productivity. There are disciplinary steps already available aside from fraternization rules to address any resulting performance issues or unresolved conflict. The fraternization rules applied by Defendant through

Page 77 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

the MCRRP and TSP at Salem Navigation Center are therefore

unconstitutional, and Plaintiff respectfully requests this court to strike them

down.


VII. Injuries


128. The injuries of Plaintiff sustained by Defendant's actions to

prohibit social contact and personal connections with Vee and other staff

members are social and psychological in nature. He cannot determine with

confidence whether Vee was being completely honest at the meeting on

the 11th of February, 2025. There was so much pressure for her to lie due

to the fraternization policies applied at Salem Navigation Center if indeed

she does have a budding personal interest in Plaintiff, whether platonic or

romantic. If those feelings were present but not strong enough yet to

express, the meeting may have sabotaged what could have been an

intimate association. She may not even be comfortable with him as her

friend.

129. What he can determine with confidence is that the fraternization

policies applied at Salem Navigation Center has at times influenced her

reluctance to connect with Plaintiff in meaningful ways, and has adversely influenced his attempts to socially connect with her, to invite her for a beverage outside the shelter setting, to give her gifts, to show her that he is a safe person to have in her life, and that he is worthy of being an important part of it. Overall, their communication climate is highly complicated and has suffered primarily because of Defendant's policies.

130. Denying Plaintiff's right to form an intimate association with Vee through the fraternization policies has been psychologically debilitating, as he experiences and foresees experiencing significant grief, anxiety, depression, frustration, confusion, and general mental anguish in response to the prospect of never being able to become a secure facet in Vee's life and her in his life.

131. Prohibiting Plaintiff from building personal connections with other staff members such as Ryan, Dominic, Justin, and Valerie is likewise deeply violating socially and psychologically, as if the company is exercising an unwarranted overreach of power over Plaintiff's life when he would like to form meaningful and enduring connections with them as well.

132. The false allegations of sexual harassment made by Zach is particularly damaging to Plaintiff's reputation. It is humiliating to be accused

of sexual harassment, especially when he did not perform that conduct. That accusation has further complicated his ability to form a meaningful connection with Vee.

## VIII. Relief

133. Plaintiff is requesting injunctive relief in the form of an order, formally designating Defendant as a state actor in their operations generally and in the operation of the MCRRP and TSP at Salem Navigation Center.

134. Additionally, he is requesting injunctive relief in the form of an order, striking for failure to pass strict scrutiny the following from Article Social Conduct, Section Q on page 3 of Defendant's Transitional Shelter Program Rules and Guidelines: the sentence "social contact between staff and client other than that scheduled by the program", and the words "personal or" from the phrase "asking questions of a personal or sexual nature".

135. Additionally, he is requesting injunctive relief in the form of an order, striking for failure to pass strict scrutiny the following from Article

Page 80 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

Social Conduct, Section P on page 3 of Defendant's Transitional Shelter Program Rules and Guidelines: the word "gifts".

136. Additionally, Plaintiff is requesting injunctive relief in the form of an order, striking for failure to pass strict scrutiny the following from Article XII, Section B on page 11 of Defendant's Transitional Shelter Program Rules and Guidelines: the sentence "social contact other than that scheduled by the program"; the words "personal or" from the phrase "asking questions of a personal or sexual nature; and the words "excessive familiarity".

137. Additionally, Plaintiff is requesting injunctive relief in the form of an order, striking for failure to pass strict scrutiny any and all of Defendant's policies and procedures throughout the company that prohibits all staff members and clients from forming intimate associations with one another.

138. Additionally, Plaintiff is requesting injunctive relief in the form of an order, compelling Defendant to revise all of the policies and procedures within their authority impacting their staff members' and clients' right to form intimate associations with one another in the MCRRP and TSP and the associated privacy rights for the purpose of preserving those rights, based on a test to determine if a fraternization policy rule is compelling and

narrowly tailored with the least restrictive means, weighing the following factors:

(a) whether a staff member subject to the formation of an intimate association with a client carries supervisory and/or decision-making authority over the client;

(b) whether there are avenues available to remove supervision and/or decision-making authority when an intimate association is realized;

(c) whether there are policies and/or procedures available other than those prohibiting the formation of intimate associations that are narrowly tailored to addressing the safety and well-being of staff and clients in a similar manner as fraternization rules seek to address; and

(d) whether reasonable accommodations between two individuals in an intimate association could be made available in the event a breakdown in the intimate association occurred and caused such

Page 82 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

hostility between them that it may result in a hostile work environment.

139. Additionally, Plaintiff is requesting injunctive relief in the form of an order, compelling Defendant to retract the 2-11-2025 behavior modification contract, remove it from their system of records, and send Plaintiff confirmation by letter conveying that such actions have been completed.

IX. Certification and Closing

140. Under Federal Rule of Civil Procedure 11, by signing below, Plaintiff certifies to the best of his knowledge, information, and belief that this complaint:

- is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

Page 83 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

- is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law;

- the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

- the complaint otherwise complies with the requirements of Rule 11.

141. Plaintiff agrees to provide the Clerk's Office with any changes to his address where case–related papers may be served. He understands that his failure to keep a current address on file with the Clerk's Office may result in the dismissal of his case.

142. Date of signing: 02/19/2025

Signature of Plaintiff: _____

Printed Name of Plaintiff: Blu Kasadu

Page 84 -COMPLAINT FOR VIOLATION OF CIVIL RIGHTS